UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

JOHN MICHAEL DENHAM : Civil Action No. 3:02-CV-00181 RLY
:
Plaintiff, :
:
v. :
:
EVANSVILLE MARINE SERVICE, INC. :
and THE CAPTAIN ELROY :
:
Defendants. :

**DEFENDANTS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

COME NOW Defendants, Evansville Marine Service, Inc. and The Captain Elroy, and pursuant this Court's oral Order of September 24, 2004, hereby submit the following Proposed Findings of Fact and Conclusions of Law.

I.    **FINDINGS OF FACT**

**Jurisdiction:**

1.    This action was brought by Plaintiff John Michael Denham ("Plaintiff") against Defendants Evansville Marine Service, Inc. ("EMS") and The Captain Elroy (collectively hereinafter "Defendants"), pursuant to the Jones Act, 46 App. U.S.C. § 688, and General Maritime Law. Plaintiff alleged he was a Jones Act seaman and sought damages for injuries suffered in an accident that occurred on November 29, 2001, alleging his injuries were caused by the negligence of his employer, EMS, and/or unseaworthiness. Defendants denied liability under the Jones Act and/or General Maritime Law, specifically denying Plaintiff's status as a Jones Act seaman.

(Complaint, Doc. 1; Amended Complaint, Doc. 63; Answer Amended Complaint, Doc. 66).

2.      Subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1333 was disputed. Defendants contend Plaintiff was not a Jones Act seaman at the time of his injury, but was a harbor worker, covered by the Longshore and Harbor Workers' Compensation Act ("LHWCA"), arguing Plaintiff did not spend a substantial amount of his time aboard a vessel in navigation as required by the United States Supreme Court decision of *Chandris v. Latsis*, 515 U.S. 347, 115 S. Ct. 2172, 132 L. Ed. 2d 314 (1995). (Complaint, Doc. 1; Amended Complaint, Doc. 63).

3.      This case is before the Court pursuant to a settlement agreement between the parties, which calls for the Court to resolve the issue of Plaintiff's status as a Jones Act seaman.

**Procedural Posture:**

4.      Plaintiff filed suit against Defendants on September 19, 2002. (Complaint, Doc. 1). The Complaint invokes this Court's admiralty jurisdiction and seeks damages for injuries suffered by Plaintiff on November 29, 2001, when he fell from a barge cover into the hull of moored cargo barge. (Complaint, Doc. 1; Amended Complaint, Doc. 63).

5.      The Complaint sought damages arising from Plaintiff's personal injury and alleged Plaintiff's damages were caused by the negligence of EMS and/or the unseaworthiness "of the vessels provided to Plaintiff" on the date of the incident.

(Complaint, Doc. 1; Amended Complaint, Doc. 63). The Complaint also sought recovery of maintenance and cure under General Maritime Law. Plaintiff alleged he was a Jones Act seaman assigned as a crewmember aboard vessels. Defendants denied liability under the Jones Act and/or General Maritime Law, specifically denying Plaintiff's status as a Jones Act seaman and contending Plaintiff was a harbor worker covered by the LHWCA at the time of his injury. (Complaint, Doc. 1; Amended Complaint, Doc. 63; Answer Amended Complaint, Doc. 66).

6.    On January 27, 2004, Plaintiff moved the Court for Partial Summary Judgment on the issue of Jones Act seaman status. (Plaintiff's Motion for Partial Summary Judgment, Doc. 42; Brief in Support of Motion, Doc. 43).

7.    On January 28, 2004, Defendants moved the Court for Summary Judgment on the issue of Jones Act seaman status. (Defendants' Motion for Summary Judgment, Doc. 44; Brief in Support of Motion, Doc. 45).

8.    The parties reached a settlement of all claims on May 4, 2004. The settlement agreement required payment of a sum certain to Plaintiff from the Jones Act insurer and an additional amount from the LHWCA insurer. An additional sum certain payment is to be made if the Court determines Plaintiff was a Jones Act seaman at the time of the incident with no additional payment due should the Court determine he was a harbor worker covered by the LHWCA. The parties waived the right to appeal from the Court's ruling on this issue. The settlement was approved by the Court as fair and reasonable during proceedings conducted on May 18, 2004.

9.    As part of the above-described settlement, Plaintiff entered a settlement of his claim

under the Longshore and Harbor Workers' Compensation Act ("LHWCA"). The LHWCA settlement was approved and accepted by Charles D. Lee, District Director, Sixth Compensation District, U.S. Department of Labor, on May 5, 2004.

10. By Court Order dated May 13, 2004, the Court set a September 23, 2004 trial date for the presentation of evidence in order to facilitate its decision on the issue of seaman status, denying both Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment. (Order, Doc. 83).

11. The issue of Jones Act seaman status was tried to the Court from September 23, 2004 through September 24, 2004. Plaintiff argues he is a Jones Act seaman. Defendants contend Plaintiff was a harbor worker at the time of his injury and has not satisfied his burden of proving seaman status. Specifically, Defendants contend Plaintiff did not prove he had the requisite substantial connection to a vessel or identifiable fleet of vessels in navigation at the time of his injury. Defendants also moved the Court for Judgment as a Matter of Law after completion of Plaintiff's case and renewed the Motion at the close of all evidence, arguing Plaintiff failed to introduce evidence to carry his burden of proving seaman status. Defendants contend Plaintiff failed to introduce any evidence as to the percentage of time he spent aboard a vessel in navigation. The Court took these Motions under advisement.

**Parties:**

12. Evansville Marine Service ("EMS") is in the business of fleeting, repairing, and cleaning moored cargo barges owned by various customers. (Stipulations, Doc. 102). EMS has six locations between Evansville, Indiana and Owensboro, Kentucky. The

750 Fleet is located at Mile 751 on the Kentucky bank of the Ohio River. EMS was Plaintiff's employer at the time of the incident and the operator of the *M/V Blue Grass*, *M/V Edna Hicks*, *M/V Captain Elroy*, *M/V Lloyd C.*, *M/V Mary B.*, and *M/V Theresa Ann*. (Stipulations, Doc. 102).

13. Defendant The Captain Elroy ("*M/V Captain Elroy*") is a harbor tug owned and operated by EMS. Plaintiff worked, from time to time, aboard the *M/V Captain Elroy* while employed at the 750 Fleet. The *M/V Captain Elroy* was tied up, without a crew, and not in navigation at the time of the incident.

14. Plaintiff began working for EMS in February, 2000. Plaintiff worked at the 750 Fleet from June 15, 2001 through the date of his injury, November 29, 2001. (Stipulations, Doc. 102). At the 750 Fleet, Plaintiff worked cleaning moored barges, spreading and stacking barge covers, performing general maintenance and repair work around the 750 Fleet facility, and gathering supplies ("non-vessel work"). In addition, although Plaintiff would generally board a harbor tug each day, he spent only a small fraction of his time performing work on these harbor tugs and thus did not spend a substantial amount of his working time carrying out duties aboard a vessel in navigation. The work he performed on these vessels in navigation included shifting, fleeting, and dock spotting duties, as well as conducting vessel and fleet checks ("vessel work").

15. Plaintiff argues he was classified as a "deckhand" while working at the 750 Fleet and therefore qualifies as a Jones Act seaman. Defendants characterize Plaintiff's work status as one in which he performed both deckhand (vessel) and dockhand (non-vessel) work. This semantic distinction is irrelevant. Plaintiff's specific job title is

not determinative of whether he qualifies as a seaman. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 364, 115 S. Ct. 2172, 132 L. Ed. 2d 314 (1995); *Harbor Tug and Barge Co. v. Papai*, 520 U.S. 548, 558, 117 S. Ct. 1535, 1542 (1997); *South Chicago Coal & Dock Co. v. Bassett*, 309 U.S. 251, 60 S. Ct. 544, 84 L. Ed. 732 (1940). Rather, the Court must examine his essential job duties at the 750 Fleet.

**Accident:**

16. Plaintiff was injured on November 29, 2001 when he fell from where he was standing on barge cover number three into the hull of a moored cargo barge, Barge No. MEM 94259, during stacking operations. Stacking barge covers is land-based work, which did not call for Plaintiff to be aboard a vessel or identifiable fleet of vessels in navigation. During stacking operations, the pilot and crew would leave the harbor tug tied off and unmanned and board the barge or Northwest crane barge, which were moored.

17. Barge No. MEM 94259 was owned by Memco, a customer of EMS and was moored throughout the stacking procedure, including the time of the incident. Barge No. MEM 94259 has no motive power of its own. There was conflicting testimony as to whether the barge was moved in place by Plaintiff's crew or another.

18. The Northwest crane used to facilitate the stacking procedure was located aboard a crane barge that was used exclusively as a work platform. The crane barge has no motive power or crew quarters of its own and was not used to transport cargo or passengers. At the time of the incident, the Northwest crane barge was tied off to a spudded work platform. Bob Aldrich, President and CEO of EMS, testified that a

walkway was attached to the spudded work platform, allowing employees to walk directly to the work platform, and, thus, the Northwest crane barge, from the parking lot of the 750 Fleet facility. Plaintiff confirmed that the walkway was available and that he did use the walkway to access the cleaning area.

19. The Northwest crane used in the stacking procedure on November 29, 2001 was operated by David Wallace ("Wallace"), an EMS employee who also served as a pilot of EMS harbor tugs. Robert Parks ("Parks") was assisting Plaintiff in completing the stacking procedure on the day of the accident.

20. The *M/V Captain Elroy*, the harbor tug on which Wallace, Parks, and Plaintiff had worked on the morning of November 29, 2001, was tied up, without a crew, and not in use or in navigation at the time of the incident.

**Relevant Job Assignments**

21. Plaintiff worked in various positions for EMS from February, 2000 through the date of the incident.

22. In February, 2001, Plaintiff was transferred to the 759 Fleet. While working at the 759 Fleet, Plaintiff performed only vessel work aboard harbor tugs. He did not perform any barge cleaning or preparation duties such as sweeping or washing barges and stacking or spreading barge covers (non-vessel work).

23. Plaintiff's new job assignment at the 750 Fleet began on June 15, 2001 and involved substantially different job duties than at the 759 Fleet. Plaintiff job duties at the 750 Fleet primarily consisted of barge cleaning, stacking and spreading covers, and other miscellaneous land-based tasks that do not involve work on a vessel in navigation.

A small fraction of Plaintiff's time was spent working aboard EMS harbor tugs while they were crewed and underway and were therefore vessels in navigation. The vast majority of Plaintiff's time working at the 750 Fleet involved the performance of non-vessel duties that Plaintiff did not perform while working at the 759 Fleet. As a result, Plaintiff's transfer to the 750 Fleet was a new assignment with substantially different essential job duties than at the 759 Fleet.

24.     Only those tasks performed during Plaintiff's assignment to the 750 Fleet are relevant to the Jones Act seaman status inquiry. *Harbor Tug and Barge Co. v. Papai*, 520 U.S. 548, 556, 117 S. Ct. 1535, 1541 (1997).

**Plaintiff's Work at the 750 Fleet**

25.     During his employment at the 750 Fleet, Plaintiff worked a total of 1,323 hours. (Stipulations, Doc. 102).

26.     During his employment at the 750 Fleet, Plaintiff spent the vast majority of his time cleaning barges and stacking or spreading barge covers (barge preparation tasks), as well as other land-based work at the dock or in the fleet, all non-vessel work, which was not performed aboard a vessel or identifiable fleet of vessels in navigation. While these cleaning and preparation duties were being performed, the harbor tug was tied up and without a crew.

27.     The 750 Fleet did not have a dedicated cleaning crew at the time of Plaintiff's injury. As a result, all EMS employees were required to spend all available free time cleaning and completing barge preparation tasks ("non-vessel work"). In addition, workers were frequently required to perform general maintenance and repair around

the 750 Fleet facility and the gathering of supplies, also non-vessel work.

28. Patrick McCubbins ("McCubbins"), a former co-worker of Plaintiff's at the 750 Fleet, testified that all workers were required to perform what he called "land work." McCubbins stated that all EMS employees assigned to the 750 Fleet performed land-based tasks such as cutting the grass and taking out the trash, in addition to barge cleaning and preparation work, on a regular basis.

29. David Wallace was trained both as a pilot and crane operator. Because of his ability to operate cranes, Wallace and his crew (which generally consisted of Plaintiff and Parks) acted as the primary cleaning crew at the 750 Fleet. Wallace testified at trial that he operated the crane for barge cleaning and preparation activities 365 days per year. He further testified that if cleaning or preparation tasks were performed, these tasks were most likely completed by Wallace and his crew. This fact was confirmed by Parks, who testified that Wallace's crew, including Plaintiff, cleaned/prepared three to four barges per day. Wallace estimated that preparing/cleaning this number of barges, depending upon the task and the product transported in the barge, would often take the entire 12 hour shift to complete.

30. Wallace and his crew, including Plaintiff, spent a greater amount of time working as the cleaning crew than any other employees at the 750 Fleet. Wallace stated that because of his ability to operate cranes, his crew would generally be responsible for any cleaning or barge preparation tasks. If more than one crew was working at the 750 Fleet on any given day, Wallace's crew would be primarily responsible for completing barge cleaning and preparation tasks. As a result, the vast majority of

Plaintiff's time was spent performing non-vessel work at the 750 Fleet.

31. Plaintiff was involved in the non-vessel work of stacking barge covers at the time of his injury.

32. Plaintiff spent only a small fraction of his time working aboard several harbor tugs, including: *M/V Blue Grass*, *M/V Edna Hicks*, *M/V Captain Elroy*, *M/V Lloyd C.*, and *M/V Mary B*. These harbor tugs were the only vessels operated by EMS with motive power. Typically, the harbor tugs traveled a maximum of two miles from the 750 Fleet facility, although most trips were shorter. The harbor tugs are the only "vessels in navigation" for purposes of determining Jones Act seaman status. (Stipulations, Doc. 102).

33. The small fraction of work Plaintiff performed aboard the harbor tugs included shifting, fleeting, dock spotting, building tow, as well as vessel and fleet checks ("vessel work"). This vessel work was performed while the harbor tug was underway (in navigation) with a pilot at the helm and was logged the majority of the time on vessel log sheets.

34. Wallace testified that he often did not log non-billable movements such as checking fleets and vessel checks. Fleet checks were frequently accomplished in a single trip, combined with a billable movement that was logged. For example, Wallace testified that fleet checks were frequently conducted while passing the fleet on the way to a separate task. In addition, log sheets completed by Wallace do contain some non-billable moves. All other EMS pilots with whom Plaintiff worked, logged all movements and activities, whether billable or not.

35.     Plaintiff was not provided meals aboard the harbor tugs and there were no sleeping quarters. Plaintiff was never required to work overnight aboard the harbor tugs, but, rather, returned home each evening.

36.     The barges passing through the 750 Fleet for fleeting, cleaning, stacking, spreading and multiple other services were variously owned and did not belong to EMS. These barges came from varied points of origin and have distinct destinations, coming and going sporadically. The barges transiting the 750 Fleet remained there from several hours to several days and often never returned. These barges, therefore, were not part of an identifiable fleet of vessels and were not in navigation. The time Plaintiff spent working aboard these variously owned barges is not considered in determining Jones Act seaman status.

**Evidence on the Issue of Substantial Connection**

37.     Plaintiff introduced no evidence on the issue of whether Plaintiff had a substantial connection to a vessel in navigation. Plaintiff's expert, Pat Jamison ("Jamison"), testified 100% of Plaintiff's work was as a deckhand, meaning he was a Jones Act seaman. Jamison clearly was not applying the appropriate test for seaman status and his testimony was not helpful in that it shed no light on the issue of what percentage of time Plaintiff spent performing his duties aboard a vessel in navigation.

38.     The small fraction of time Plaintiff spent aboard the harbor tugs while underway and, therefore, the time Plaintiff spent aboard a vessel in navigation for the period of June 15, 2001 through November 29, 2001, is reflected on the vessel log sheets. Each witness who testified at the trial of this matter confirmed that the best evidence to use

to determine what amount of time Plaintiff spent aboard a vessel in navigation is the vessel logs. The log sheets indicate the duties performed and are maintained by the pilot of the vessel.

39. In most instances, only one employee was required to perform deckhand work aboard a harbor tug. Wallace testified that when more than one worker was listed on a log sheet, he would typically only take one worker with him to complete vessel work.

40. Plaintiff offered no evidence on the crucial issue of the amount of time he spent performing non-vessel versus vessel tasks while working at the 750 Fleet. Plaintiff's trial testimony was limited to the duties he performed as an EMS employee, his job classifications, and his pay. At no point did Plaintiff indicated what percentage of his time was spent conducting vessel or non-vessel tasks.

41. No estimate of the amount of time Plaintiff devoted to vessel versus non-vessel tasks was proffered by any of Plaintiff's fact witnesses; Wallace, Parks, and McCubbins.

42. The only testimony on behalf of Plaintiff that addressed the issue of what percentage of time Plaintiff spent aboard a vessel in navigation was proffered by Plaintiff's expert, J.P. Jamison ("Jamison").

43. During the voir dire of Jamison, it was confirmed that he had limited, if any, experience with the workings of an inland harbor service. The voir dire further revealed that the standard used by Jamison to determine Plaintiff's seaman status is unsupported by the law. Jamison testified that if Plaintiff reported to one of the EMS harbor tugs at the beginning of his work shift, he was entitled to a day of service toward his Coast Guard pilot license, and, therefore, should be credited with vessel

time for the entire shift. Using this method, Jamison testified that Plaintiff spent 100% of his working time at the 750 Fleet performing seaman's work, regardless of the amount of time he spent aboard a vessel in navigation. This conclusion is unsupported by the record evidence, the applicable law and is not helpful in resolving the seaman status issue.

44. Because Jamison employed a method inconsistent with Supreme Court precedent in estimating the time Plaintiff spent performing duties aboard a vessel in navigation, no weight will be accorded Jamison's estimate and testimony.

45. Captain David E. Hammond ("Hammond") testified as an expert witness on behalf of Defendants. Hammond has over 30 years of experience working in the inland river system. He has worked in various capacities during his career, from deckhand to Captain, on both line haul boats and harbor tugs. He is currently the Vice President of Inland Marine Service, Inc. ("IMS"). IMS has operated both line haul boats, as well as a harbor service in the St. Louis area. Hammond has also been retained by marine companies to "audit" fleeting practices and the use of log sheets.

46. Hammond testified he spent 30 hours reviewing all log sheets for EMS harbor vessels to which Plaintiff could have been assigned while working at the 750 Fleet. He made a site inspection of the 750 Fleet in order to become familiar with the vessel operations and record keeping. During the site inspection, Hammond interviewed Bob Aldrich and Doug Gray of EMS to discuss EMS operations and record keeping policy and practice.

47. Based upon his experience and investigation, Hammond testified that Plaintiff spent

between 75.31% and 81.31% of his work time performing non-vessel activities. The remaining 18.69% to 24.69% of his work time at the 750 Fleet aboard a vessel in navigation.

48. Defendants' exhibit E-1 represents Hammond's calculation of the maximum amount of time Plaintiff could have spent aboard a vessel in navigation, 24.69%. This figure was calculated after examining the log sheets on which Plaintiff's name appears and reconciling those log sheets with Plaintiff's pay records. For each day where no vessel check time was logged, Hammond added an additional 20 minutes to the vessel time for that particular day. If vessel check time was recorded, Plaintiff was credited with the amount of time specified, even though Plaintiff may not have been to complete the check. Some log sheets were discovered that did not list any workers, in which case Plaintiff was credited with the amount of vessel time recorded even though he may not have been on the vessel that day. The maximum vessel time estimate further assumes Plaintiff performed each vessel task listed even where two or more deckhands are listed, which is an overestimation of time Plaintiff spent performing these tasks according to Wallace's testimony.

49. Defendants' exhibit E-2 represents Hammond's calculation of the likely amount of time Plaintiff could spent aboard a vessel in navigation, 18.69%. This figure was calculated in the same manner as Exhibit E-1. However, in reaching his estimate of 18.69%, Hammond credited Plaintiff with his proportionate share of vessel time, as opposed to all vessel time. In other words, where Plaintiff was not the only worker aboard a harbor tug, the testimony was that not all workers were required to perform

the vessel tasks.  Therefore, Hammond divided the amount of vessel time for any given day by the number of workers who were listed on the log sheet, crediting Plaintiff with his proportional share.

50.     During cross-examination, Hammond explained that when windows of time exist between vessel movements, the harbor tug is not underway, but is either tied up, unmanned or partially unmanned, and the crew are performing land-based work. This testimony is based upon Hammond's experience and investigation.  All vessel movements were logged as round-trip events.  All time when the harbor tug is underway, whether performing the task or en route thereto, is logged as a single vessel movement.  Thus, time elapsing between vessel movements are devoted to the performance of land-based tasks.  Plaintiff proffer no evidence to refute this testimony.

51.     The range of vessel versus non-vessel time testified to by Hammond is reasonable and accepted by the Court.  Plaintiff offered no evidence to support a different percentage.

52.     Plaintiff failed to introduce evidence that would create an issue of fact on the issue of seaman status and, thus, failed to satisfy his burden of proving he spent a substantial amount of his working time aboard a vessel or identifiable fleet of vessels in navigation.

53.     Plaintiff was a harbor worker, covered by the LHWCA, at the time of his injury.

II.     CONCLUSIONS OF LAW

Standard for Determining Jones Act Seaman Status

1.     The Jones Act gives a seaman who suffers personal injury in the course of his employment the right to bring action for damages against his employer. Conversely, the LHWCA prescribes rates of compensation for any injured maritime worker except a master or member of a crew of any vessel. The Jones Act and the LHWCA provide mutually exclusive remedies. Generally, the term "seaman" and the phrase "member of a crew of any vessel" are interchangeable. *Petty v. Dakota Barge Service*, 730 F. Supp. 983, 985-986 (D. Minn. 1989).

2.     To recover under the Jones Act, 46 App. U.S.C. § 688, Plaintiff must prove he is a "Jones Act seaman." *Gizoni v. Southwest Marine, Inc.*, 56 F.3d 1138, 1141 (9th Cir. 1995) (citing, *Kathriner v. UNISEA, Inc.*, 975 F.2d 657, 659 (9th Cir. 1992)).

3.     To prove seaman status under the Jones Act, Plaintiff has the burden of proving:

   a.     He contributed to the function of the vessel or to the accomplishment of its mission; and

   b.     He had a connection to a vessel in navigation (or to an identifiable group of such vessels) that was substantial in terms of both its duration and its nature.

   *Chandris v. Latsis*, 515 U.S. 347, 368, 115 S. Ct. 2172, 2190, 132 L. Ed. 2d 314 (1995).

4.     A maritime worker does not become a seaman as soon as a vessel leaves the dock. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 361, 115 S. Ct. 2172, 2186, 132 L. Ed. 2d 314 (1995). The inquiry into seaman status is fact specific and will depend on the nature of the vessel and the employee's precise relation to it. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 371, 115 S. Ct. 2172, 2191, 132 L. Ed. 2d 314 (1995).

5.	The seaman inquiry is a mixed question of law and fact, and it often will be inappropriate to take the question from the jury. Nevertheless, summary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion. *Harbor Tug and Barge Company v. Papai*, 520 U.S. 548, 554, 117 S. Ct. 1535, 1540, 137 L. Ed. 2d 800 (1997).

**The Function Requirement**

6.	The United States Supreme Court classified the "function" requirement as a broad, threshold standard that makes all maritime employees who do the ship's work eligible for seaman status. *Chandris v. Latsis*, 515 U.S. 347, 368, 115 S. Ct. 2172, 2190, 132 L. Ed. 2d 314 (1995).

7.	It is uncontested that Plaintiff satisfied the first prong of the seaman status test by contributing to the function or accomplishment of the mission of the EMS harbor tugs.

**The Substantial Connection Requirement**

8.	In attempting to prove Jones Act seaman status, Plaintiff contends he was permanently assigned or performed a substantial portion of his duties aboard the harbor tugs.

9.	Plaintiff's job title is not determinative of whether he qualifies as a seaman. His connection to a vessel or fleet of vessels is dispositive. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 364, 115 S. Ct. 2172, 132 L. Ed. 2d 314 (1995); *Harbor Tug and Barge Co. v. Papai*, 520 U.S. 548, 558, 117 S. Ct. 1535, 1542 (1997); *South Chicago Coal & Dock Co. v. Bassett*, 309 U.S. 251, 60 S. Ct. 544, 84 L. Ed. 732 (1940).

10. The substantial connection test is important in distinguishing between sea- and land-based employment, for land-based employment is inconsistent with Jones Act coverage. *Harbor Tug and Barge Company v. Papai*, 520 U.S. 548, 554, 117 S. Ct. 1535, 1543, 137 L. Ed. 2d 800 (1997).

11. The fundamental purpose of the substantial connection requirement is to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection with a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea. For the substantial connection requirement to serve its purpose, the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea. This will give substance to the inquiry both as to the duration and nature of the employee's connection to the vessel and be helpful in distinguishing land-based from sea-based employees. *Harbor Tug and Barge Co. v. Papai*, 520 U.S. 548, 554-555, 117 S. Ct. 1535, 1540 (1997)(quoting, *Chandris*, 515 U.S. at 368, 115 S. Ct. at 2179)(citations omitted).

12. The "substantial connection" requirement is meant to determine which of the eligible maritime workers, those meeting the first prong of the seaman status test, have the required employment related connection to a vessel in navigation entitling them to Jones Act benefits. *Chandris v. Latsis*, 515 U.S. 347, 368-369, 115 S. Ct. 2172, 2190, 132 L. Ed. 2d 314 (1995).

13. The duration of an employee's connection to a vessel in navigation and the nature of

the employee's activities, taken together, determine whether the employee is a seaman. *Chandris v. Latsis*, 515 U.S. 347, 370, 115 S. Ct. 2172, 2190-2191, 132 L. Ed. 2d 314 (1995).

14.      While seaman status is not merely a temporal concept, it necessarily includes a temporal element. A maritime worker who spends only a small fraction of his working time **aboard a vessel in navigation** is fundamentally land-based and therefore not a member of a vessel's crew. *Chandris v. Latsis*, 515 U.S. 347, 371, 115 S. Ct. 2172, 2191, 132 L. Ed. 2d 314 (1995)(emphasis added).

15.      The Supreme Court adopted the Fifth Circuit's rule regarding the temporal element of the substantial connection prong:

> Generally, the Fifth Circuit seems to have identified an appropriate rule of thumb for the ordinary case: ***A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act.*** This figure of course serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases. * * * And where undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessel in navigation, the court may take the question from the jury by granting summary judgment or a directed verdict.

*Chandris v. Latsis*, 515 U.S. 347, 371, 115 S. Ct. 2172, 2191, 132 L. Ed. 2d 314 (1995)(emphasis added).

16.      The 30 percent rule requires the maritime employee spend 30 percent of his time <u>aboard</u> a vessel in navigation. *Parent v. M&M Towing Co., Inc.*, 1996 WL 65740, *2 (E.D. La. 1996)(emphasis added).

**Work Assignments Eligible for Consideration in Determining Seaman Status**

17. In evaluating the duties of an employee under the seaman status test, courts should not consider an employee's entire work history, but must consider only the nature of the employee's basic job assignment as it existed at the time of injury. After all, as the Court has stated, when a maritime worker's basic assignment changes, his seaman status may change as well. *Shade v. Great Lakes Dredge & Dock Company*, 154 F.3d 143, 149 (3rd Cir. 1998)(citing, *Chandris*, 515 U.S. at 372, 115 S.Ct. at 2191)

18. An employee's prior work history with a single employer does not enter the seaman determination if the employee was injured on a new assignment with the same employer. In order to qualify as a new assignment, the assignment must encompass different "essential duties" from previous assignments. *Harbor Tug and Barge Co. v. Papai*, 520 U.S. 548, 556, 117 S. Ct. 1535, 1541 (1997).

**Only Plaintiff's Work at the 750 Fleet is Eligible for Consideration in the Determination of Seaman Status**

19. Plaintiff's new job assignment at the 750 Fleet, beginning on June 15, 2001, involved substantially different job duties than at the 759 Fleet. In February, 2001, Plaintiff was transferred to the 759 Fleet. While working at the 759 Fleet, Plaintiff performed only vessel work. Once transferred to the 750 Fleet, Plaintiff's job duties primarily consisted of barge cleaning and preparation tasks and other miscellaneous tasks that do not involve work on a vessel in navigation. The majority of Plaintiff's time working at the 750 Fleet involved the performance of non-vessel duties that Plaintiff did not perform while working at the 759 Fleet.

20. Plaintiff's transfer to the 750 Fleet constitutes a new assignment. Only those tasks performed during Plaintiff's employment at the 750 Fleet are eligible for consideration in the determination of Jones Act seaman status.

**Vessels in Navigation**

21. In determining whether a vessel is "in navigation" for purposes of the Jones Act, the inquiry into the nature of the employee's relationship to the vessel must focus on whether the employee performs duties taking him to sea. *Harbor Tug*, 520 U.S. at 555, 117 S. Ct. at 1540.

22. A worker becomes a seaman not by the physical characteristics of the structure to which he is assigned, but because the structure is operational in navigation exposing him to "seaman's hazards." *DiGiovanni v. Traylor Bros., Inc.*, 959 F.2d 1119, 1123 (1st Cir. 1992).

23. A vessel is "in navigation" when engaged as an instrument of commerce and transportation on navigable waters. *McKinley v. All Alaskan Seafoods, Inc.*, 980 F.2d 567, 569 (9th Cir. 1992).

24. Courts have consistently recognized that "floating is not enough." *Bernard v. Binnings Constr. Co.*, 741 F.2d 824, 828 n. 13 (5th Cir. 1984); *DiGiovanni*, 959 F.2d at 1123; *Sala v. Gates Const. Corp.*, 868 F. Supp. 474, 478 (E.D.N.Y. 1994). Nor is the capability to move across the navigable waters. *Bernard*, 741 F.2d at 829. These holdings support the proposition that the physical characteristics of a structure are not determinative of whether a worker is injured aboard a vessel "in navigation." *DiGiovanni*, 959 F.2d at 1123.

25.    The test for vessel status is whether the structure was designed or used primarily for the transportation of cargo, equipment or persons across navigable waters, or was engaged in navigation at the time of the injury. *DiGiovanni v. Traylor Brothers, Inc.*, 959 F.2d 1119, 1123 (5th Cir. 1992) (citing, *Bernard v. Binnings Construction Co.*, 741 F.2d 824 (5th Cir. 1984)).

26.    In evaluating a structure's status, the court should consider the purpose for which the craft was constructed and the business in which it is engaged. *Bernard v. Binnings Construction Co.*, 741 F.2d 824, 829 (5th Cir. 1984). If a barge or other float's purpose or primary business is not navigation or commerce, then workers assigned thereto are to be considered seaman only when it is actual navigation or transit. *DiGiovanni v. Traylor Brothers, Inc.*, 959 F.2d 1119, 1123 (5th Cir. 1992).

27.    The size of the structure, its ability to float, the permanence of its fixation to the shore or the bottom, and the fact of its movement or its capability of movement across navigable waters are not conclusive of vessel status. *DiGiovanni v. Traylor Brothers, Inc.*, 959 F.2d 1119, 1123 (5th Cir. 1992).

28.    Factors for consideration in classifying a structure as a vessel include: 1) whether the structure involved was constructed and is used primarily as a work platform; 2) whether it was moored or otherwise secured at the time of the accident; 3) whether it is capable of movement and is moved across navigable waters in the course of normal operations; and 4) whether any transportation function performed by the structure was incidental to its primary purpose serving as work platform. *Bernard v. Binnings Construction Co.*, 741 F.2d 824, 830 (5th Cir. 1984).

**Harbor Tugs**

29.     The EMS harbor tugs, the *M/V Blue Grass*, *M/V Edna Hicks*, *M/V Captain Elroy*, *M/V Lloyd C.*, *M/V Mary B.*, and *M/V Theresa Ann* are vessels in navigation for purposes of seaman status. (Stipulations, Doc. 102).

**Moored Crane Barge**

30.     A moored cleaning barge is not a vessel in navigation under the Jones Act. *Bunch v. Canton Marine Towing Co., Inc.,* E.D.Mo. No. 2:02cv00055-DJS (Jan. 6, 2004).

31.     The Northwest crane barge does not qualify as a vessel in navigation under Jones Act jurisprudence. The crane barge lacks all indicia of a vessel operating in navigation. and was tied up at the time of the incident  The dock was used solely as a work platform and is not used to transport cargo, equipment or crew. As a result, the Northwest crane barge is not a vessel in navigation. Plaintiff's work aboard the Northwest crane barge cannot, as a matter of law, form a basis for a finding of Jones Act status.

**Variously Owned Barges**

32.     A Jones Act seaman can perform his duties aboard an identifiable group of vessels rather than a single vessel and still qualify as a Jones Act seaman. A fleet of vessels constitutes an identifiable group of vessels acting together or under one control, not simply any group of vessels an employee happens to work aboard. *Barrett v. Chevron, U.S.A., Inc.*, 781 F.2d 1067, 1074 (5th Cir. 1986).

33.     An employee who performs duties such as washing, pumping, minor repairs, and building tow on variously owned barges passing through his employer's fleeting

facility is not a Jones Act seaman as a matter of law. *White v. Valley Line Co.*, 736 F.2d 304, 306 (5th Cir. 1984); *Waguespack v. Aetna Life & Casualty Co., Inc.*, 795 F.2d 523, 526 (5th Cir. 1986).

34.      The barges transiting through the 750 Fleet for fleeting and cleaning were variously owned and controlled. The barges came from innumerable locations and departed with an array of destinations and would not necessarily ever return to the 750 Fleet. These barges, including Barge MEM 94259, do not qualify as an identifiable fleet of vessels. Plaintiff's work aboard variously owned customer barges cannot, as a matter of law, form a basis for a finding of Jones Act status.

35.      Because Barge No. MEM 94259 was not engaged in "transportation" while Plaintiff prepared it for stacking, Barge No. MEM 94259 was not a vessel in navigation and will not support a finding of Jones Act seaman status.

**Plaintiff Does Not Satisfy the Substantial Connection Prong of the Seaman Status Test**

36.      Each witness who testified at the trial of this matter confirmed that the best evidence to use to determine what fraction of time Plaintiff spent aboard a vessel in navigation is the vessel logs.

37.      In most instances, only one worker was required to perform vessel work. When more than one worker is listed on a log sheet, the vessel work was divided among the workers listed. Thus, not all vessel work recorded on the log sheets where Plaintiff was listed as a deckhand was performed by Plaintiff.

38.      Plaintiff offered no credible evidence of the amount of time he spent performing non-vessel versus vessel tasks while working at the 750 Fleet. Nor was an estimate of the

amount of time Plaintiff devoted to vessel versus non-vessel tasks was proffered by any of Plaintiff's fact witnesses; Wallace, Parks, and McCubbins.

39.    Pat Jamison's testimony that Plaintiff spent 100% of his working time aboard a vessel in navigation is not credible and is based on a misapprehension of the status for determining seaman status. The record evidence does not bear out Jamison's opinion. Furthermore, the method employed at reaching this estimate is usupported by the facts presented, as well as Jones Act jurisprudence. Jamison's opinion that Plaintiff spent 100% of his working time performing vessel work and is a Jones Act seaman cannot be accorded any weight.

40.    Defendants produced evidence that Plaintiff spent between 75.31% and 81.31% of his work time performing non-vessel activities. These figures are supported in the record and conclusively demonstrate that Plaintiff had only a transitory or sporadic connection with a vessel in navigation, spending only a small fraction of his time working aboard a vessel in navigation.

41.    Plaintiff did not produce any evidence that his work aboard EMS harbor tugs "took him to sea" as the phrase is used in Jones Act jurisprudence. Rather, Plaintiff reported for work each morning and spent the majority of his time performing non-vessel work on a work platform or the 750 Fleet dock. Plaintiff returned home each evening and was never required to go on an overnight trip.

42.    Plaintiff did not have a substantial connection to a vessel or identifiable fleet of vessels. Plaintiff was not a Jones Act seaman at the time of his injury, but rather was a longshoreman, covered by the LHWCA.

**Defendants' Motion for Judgment as a Matter of Law is Granted**

43.     Defendants moved the Court for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 52 following the completion of Plaintiff's case. The Court took Defendants' Motion under advisement. Having reviewed the controlling law on the issue of seaman status and considering the evidence presented by Plaintiff during his case, the Court holds Plaintiff failed to introduce any evidence as to the percentage of time he spent aboard a vessel in navigation. The Court further holds that Plaintiff's claim of seaman status cannot be maintained under controlling law. The Court hereby grants Defendants Motion for a Judgment as a Matter of Law on the issue of seaman status.

44.     At the close of all evidence, Defendants renewed their Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 52. The Court took Defendants' Motion under advisement. Having reviewed the controlling law on the issue of seaman status and considering the evidence presented by both parties, the Court holds Plaintiff failed to introduce any evidence as to the percentage of time he spent aboard a vessel in navigation. The Court further holds that Plaintiff's claim of seaman status cannot be maintained under controlling law. The Court hereby grants Defendants Motion for a Judgment as a Matter of Law on the issue of seaman status.

**The Evidence, Taken as a Whole, Establishes Plaintiff was not a Jones Act Seaman**

45.     Having considered the evidence presented by both parties, the Court holds Plaintiff failed to satisfy his burden of proof on the issue of Jones Act seaman status. Specifically, the Court holds that Plaintiff failed to present sufficient evidence to

demonstrate that he maintained a substantial connection with a vessel or identifiable fleet of vessels in navigation. The Court finds Plaintiff was a harbor worker, covered by the LHWCA, at the time of the incident.

Respectfully submitted,


**s/ Todd M. Powers**
Todd M. Powers
Schroeder, Maundrell, Barbiere & Powers
11935 Mason Road, Suite 110
Cincinnati, Ohio 45249-3703
Telephone:    513-583-4212
Facsimile:    513-583-4203
tpowers@schroederlaw.com
**Attorney for Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served upon the following via electronic filing and/or ordinary U.S. mail delivery this 6th day of October, 2004.

Neil Chapman, Esq.
DANKS & DANKS
101 Northwest Tenth Street
Evansville, IN 47708

A.V. Conway, II, Esq.
124 West Union Street
P.O. Box 25
Hartford, KY 42347
**Attorneys for Plaintiffs**

                                                  **s/ Todd M. Powers**

                                                 Todd M. Powers
Schroeder, Maundrell, Barbiere & Powers
11935 Mason Road, Suite 110
Cincinnati, Ohio 45249-3703
Telephone:    513-583-4212
Facsimile:    513-583-4203
tpowers@schroederlaw.com
**Attorney for Defendants**